OPINION OF THE COURT
Renee R. Roth, J.
At issue in these final accountings for three common trust funds is whether the decision of each accounting corporate trustee to terminate its fund was proper. In each case, the former common trust units held for individual trusts have been converted into shares of mutual funds under the corporate fiduciary’s control. Although it appears that such conversions have been approved in the past, there is no judicial comment on their merits despite the troubling issue that they raise, namely, whether the dismantling of common trusts leaves the beneficiaries of the underlying trusts less protected than they had been.
Petitioners represent that the impetus for these conversions was the amendment of section 584 (h) of the Internal Revenue Code of 1986. As a result of such amendment, a financial institution maintaining a common trust fund may now exchange the units of such fund for corresponding units of a mutual fund under its control without recognizing any gain or loss for income tax purposes. In the past, any such exchange would have constituted a taxable event with potentially adverse tax consequences for the individual estates and trusts owning units in the common trust fund.
Accordingly, conversions from interests in common trust funds to interests in mutual funds are tax-neutral transactions. But that does not necessarily mean that unconditional termination of a common trust fund is totally without disadvantage to the underlying trusts.
We turn first to the history of common trusts in New York. In the law of trusts, the common trust fund is a relative newcomer, having first emerged on the national investment scene as a *727 result of legislation during the depression era (see Matter of Bankers Trust Co. [Siegmund], 219 AD2d 266, 269-270 [1995]). Prior to such legislation, fiduciaries had been subject to an unbending mandate that they not only hold entrusted assets separately from their own individual assets, but also keep the assets of any one trust segregated from the assets of all others (Note, The Common Trust Fund Statutes — A Legalization of Commingling, 37 Colum L Rev 1384 [1937]). Thus, “[t]he novel element in the legislation authorizing common trust funds is that, contrary to the common-law rule, the trustee is permitted to commingle the assets of the otherwise separate constituent trusts under its administration” (Matter of Bankers Trust Co., 219 AD2d at 269).
In New York, the Legislature amended the Banking Law in 1937 to allow banks and trust companies to establish common trust funds. Such legislation was designed to advance the interests of individual estates and trusts in two significant respects. First, as participants in a common fund, the underlying trusts would benefit from considerably greater diversification than they separately could have afforded. Second, because the cost of administering small trusts was significantly reduced by collective investment and management, the services of corporate trustees would now be more accessible to trusts of modest value {see Mem of NY Banking Dept, Bill Jacket, L 1937, ch 687, at 13). As noted by the Surrogates’ Association, which supported the common trust fund legislation, “[t]he whole scheme is an experiment” (Letter from Surrogates’ Assn, May 27, 1937, Bill Jacket at 27). Experience has now proved such experiment to have been a success (see Matter of Jakobson, 293 AD2d 541 [2002]; Matter of Bankers Trust Co., supra), no doubt in part as a result of the special regulatory requirements imposed on the operation of such funds. Such regulations, inter alia, limit the amount of money any one underlying trust may invest in such a fund, prohibit the trustee from holding any interest in a fund other than in its fiduciary capacity and disallow payment of compensation to or by the bank for management of the fund per se (3 NYCRR part 22).
The Legislature clearly recognized, however, that judicial oversight was needed (in addition to regulatory supervision) in order to ensure the proper administration of common trust funds (Mem of NY Banking Dept, Bill Jacket, L 1937, ch 687, at 14). The statute (Banking Law § 100-c [6] [formerly subd (10)]) initially called for the filing of annual judicial accountings. Over *728 time, however, the frequency of such accountings was reduced to every three years (L 1943, ch 602), then to every four years (L 1958, ch 496), then to every six years (L 1975, ch 295), and ultimately to every 10 years (L 1986, ch 239). In the case of each such extension of the period between accountings, the Legislature’s objective was to spare the underlying trusts and their corporate trustees from the costs of frequent accountings. Nevertheless, by continuing to require periodic accountings, the Legislature demonstrated its intention to preserve the safeguard of regular judicial proceedings for common trust funds.
It was also recognized, however, that the expense of reviewing a common trust fund accounting would be disproportionate to the interests of the income and principal beneficiaries of any one underlying trust. Accordingly, the governing statute provided for the appointment of guardians ad litem to represent all such interests. The statute contemplated that two such guardians (one for income, the other for principal) would serve in each common trust accounting (Banking Law § 100-c [6]) to review the account and assess the operation of the fund during the accounting period in terms of its compliance with applicable law, its adherence to the fund’s declared investment objectives, and its observance of the precepts of prudent investing. Persons interested in the underlying trusts would thus be spared the expense of retaining separate counsel to examine the account.
As a matter of historical fact, the common trust fund has always coexisted with the mutual fund (otherwise known as a “regulated investment company,” under the Investment Company Act of 1940 [15 USC § 80a-1 et seq.]). Although the mutual fund did not achieve broad recognition as an alternative mechanism for collective investment until the 1960s, it actually predates the common trust fund as a vehicle for investment management by more than a century (see Goetzmann and Rouwenhorst, The Origins of Value: The Financial Innovations that Created Modern Capital Markets [2005]). Common trust funds and mutual funds have at times overlapped, since banks in some cases invest portions of their common trust funds in mutual funds, including mutual funds with which they are affiliated (as permitted by statute [EPTL 11-2.2 (b) (1); 11-2.3 (d)]).
As noted at the outset, the petitions before the court disclose that petitioners now hold proprietary mutual fund shares not as trustees of common trust funds, but instead, as trustees of the underlying trusts. As indicated above, such direct holding is per se permissible under statutory law. The question remains, *729 however, whether the court should unconditionally approve the process by which such trust investments were achieved, i.e., through the termination of common trust funds.
Prior to its amendment some 20 years ago, section 100-c of the Banking Law had expressly required that a bank or trust company could neither create nor alter a common trust fund without the approval of the State Banking Board (former Banking Law § 100-c [4]). Such statutory requirement was eliminated in 1986 by legislation that repealed the original provisions and replaced them with a much abbreviated statutory scheme for common trust funds (L 1986, ch 239). Nor do the applicable regulations themselves suggest that a bank must obtain any agency’s approval for a change (including termination) of the fund.
Although it thus appears that petitioners were not technically required to obtain approval prior to converting their common trust funds, they nonetheless apprised the Superintendent of Banks for New York in advance of such conversions and they report that the Superintendent did not object. It is observed that petitioners did not seek judicial approval prior to undertaking these conversions.
At the court’s request, petitioners filed submissions detailing the facts and circumstances with respect to the conversion from common trust funds to corresponding mutual funds. Through such submissions, petitioners have demonstrated, and the guardians ad litem appointed in each proceeding have confirmed, that such conversions provide certain benefits to the underlying trusts, including the enhanced portability of shares of mutual funds (which, unlike units of common trust funds, are distributable in kind to beneficiaries), daily pricing of shares of mutual funds and greater liquidity of such shares compared to units of common trust funds.
Petitioners acknowledge, however, that they also derived certain benefits from these conversions, namely, the elimination of duplicative investment portfolios, an increase in the size of their proprietary mutual funds and an enhanced opportunity to retain a connection to assets of the underlying trusts upon their termination. They maintain, and the guardians ad litem appear to agree, that these benefits do not come at the expense of an underlying trust’s investment return, since petitioners are legally prohibited from double dipping by, on the one hand, charging fees for their services to their proprietary funds as investment advisors, custodians, transfer agents, etc., and, on *730 the other hand, claiming commissions on trust assets invested in such funds (EPTL 11-2.3 [d]).
Petitioners’ decision to convert their common trust units into shares of their own mutual funds is subject to eventual challenge if such choice appears to have caused loss or excessive expense when compared to the performance and costs of alternative investments. It is observed, however, that petitioners’ termination of their common trust funds threatens to deny the underlying trusts the protection of a regular and relatively inexpensive forum for raising such a challenge through a decennial accounting. The guardians ad litem in these proceedings have expressed concern that their wards are being deprived of the safeguards specifically provided for accountings under section 100-c of the Banking Law. Such concern is not eliminated by the fact that mutual funds are subject to regulatory oversight by various federal agencies, especially in view of recently reported failures by such agencies to perform their oversight duties thoroughly (see, e.g., Floyd Norris, Manager Prospered as Investors Suffered, New York Times, Nov. 14, 2003, at Cl; Stephen Labaton, S.E.C.’s Oversight of Mutual Funds is Said to be Lax, New York Times, Nov. 16, 2003, at 11; Gretchen Morgenson, 2 Mutual Funds Move to Assure Wary Investors, New York Times, Nov. 14, 2003, at Al).
Petitioners nonetheless point out that persons interested in the underlying trusts retain their rights to compel an accounting of the banks’ proceedings with respect to their mutual fund investments as well as all other components of the trusts’ portfolio. The short answer to such observation is that the age-old right of a beneficiary to compel an accounting for a particular trust falls far short of what is needed to investigate the operations of a 21st century mutual fund. In other words, given the massive size of the typical mutual fund ($25 billion in the case of one of the mutual funds sub judice), as a practical matter such investigation can be undertaken meaningfully only through the collective cost-sharing that is an integral part of the common trust fund accounting under Banking Law § 100-c. In permitting banks and trust companies to invest fiduciary accounts instead through affiliated mutual funds (EPTL 11-2.3 [d]), the Legislature may not have perceived one of the subtle consequences of such allowance, i.e., that corporate trustees could make an end run around the safeguards otherwise required of their collective investments for fiduciary accounts under the Banking Law.
*731 Moreover, in view of the fact that these conversions involve the investment of entrusted assets in the trustees’ affiliated mutual funds, the loss of safeguards under section 100-c of the Banking Law is particularly troubling. In other words, the element of self-dealing suggests a need for greater, not less, oversight even though the banks are authorized to make such investments. The statute conferring such authority (EPTL 11-2.3 [d]) had a well defined purpose, namely, to enable banks to compete with securities firms by allowing the banks to choose a more easily administered common investment vehicle (the mutual fund) over another available option (the common trust fund) (see Senate and Assembly Sponsors’ Mems in Support, Bill Jacket, L 1994, ch 609). The terms and history of such statute are, however, silent as to the consequence of such statutory largesse where a bank chooses to opt out of a common trust and into direct investment in an affiliated mutual fund, namely, the loss of the periodic judicial accountings that had protected the beneficiaries of the underlying trusts. Simply put, such loss appears to have been an unintended by-product of section 11-2.3 (d) and may be too high a price to pay for the salutary objective that inspired its enactment.
In view of the several practical advantages that they have reaped for the underlying trusts, these conversions should not at this juncture be disturbed in the absence of a clear legislative intention to prohibit them. Nevertheless, as indicated by the above discussion, there is reason to recommend that the Legislature revisit the statute to put safeguards in place with respect to investments in affiliated mutual funds. A copy of this decision is therefore being sent to the respective chairs of the Judiciary and Banking committees of the New York State Assembly and Senate, the Attorney General of the State of New York and the Office of Court Administration Surrogate’s Court Advisory Committee for consideration of a proposal to such effect.